UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**DELAINE SMITH; BRIAUNA BOSWORTH;
SHARRONA BRIGHTMAN; and
ELIZABETH MULRONEY**

      **Plaintiffs,**

**vs.**                                      **Case No.:**

 **SHERIFF MIKE WILLIAMS,**
in his official capacity as Sheriff of the
Consolidated City of Jacksonville, Florida,
**J.H. WING, individually; F. CANNADAY, individually;
D.D. STUHR, individually; and C.S. JOHN, individually.**

      **Defendant.**

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs bring this action seeking declaratory and injunctive relief, damages, attorney's fees and costs against Defendants and alleges:

1.     This is an action for declaratory relief, injunctive relief, damages, attorney's fees and costs for the deprivation and to prevent the deprivation by Defendant Williams and his agents, acting under color of state law, of Plaintiffs' rights, privileges and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court in invoked under 28 U.S.C. §§1331, 1343, and 2201, *et seq.*; this suit being authorized by the United States Constitution and 42 U.S.C. §1983.

3.     Venue in this district is proper pursuant to 28 U.S.C. §1391, in that the cause of action arose in this district.

## PARTIES

4.      Plaintiff Delaine Smith is a resident of Duval County, Florida, and the United States of America.

5.      Plaintiff Briauna Bosworth is a resident of Duval County, Florida, and the United States of America.

6.      Plaintiff Sharrona Brightman is a resident of Duval County, Florida, and the United States of America.

7.      Plaintiff Elizabeth Mulroney is a resident of Duval County, Florida, and the United States of America

8.      Defendant, J.H. Wing, was, at all times relevant, a sworn member of the Jacksonville Sheriff's Office. At all times relevant to this cause, Defendant Wing acted in conformity with the customs, practices, and policies of the Jacksonville Sheriff's Office and acted under the color of state law.

9.      Defendant, F. Cannaday, was, at all times relevant, a sworn member of the Jacksonville Sheriff's Office. At all times relevant to this cause, Defendant Cannaday acted in conformity with the customs, practices, and policies of the Jacksonville Sheriff's Office and acted under the color of state law.

10.      Defendant, D.D. Stuhr, was, at all times relevant, a sworn member of the Jacksonville Sheriff's Office. At all times relevant to this cause, Defendant Stuhr acted in conformity with the customs, practices, and policies of the Jacksonville Sheriff's Office and acted under the color of state law.

11.      Defendant, C.S. John, was, at all times relevant, a sworn member of the Jacksonville Sheriff's Office. At all times relevant to this cause, Defendant John acted in

conformity with the customs, practices, and policies of the Jacksonville Sheriff's Office and acted under the color of state law.

12.     Defendant, Mike Williams, in his official capacity as Sheriff of the City of Jacksonville, Florida, was at all times relevant, responsible for the supervision, training, instruction, discipline, control, and conduct of police officers of JSO and made policy for JSO with respect to seizures, searches, arrests, and use of force. At all times relevant, Defendant Williams had the power, right, and duty to train and control his officers, agents, and employees to conform to the Constitution of the United States and to ensure that all orders, rules, instructions, and regulations promulgated for JSO were consistent with the Constitution of the United States. At all times relevant, Sheriff Williams, his agents and employees acted under color of state of law.

## **FACTUAL ALLEGATIONS**

13.     This case arises from the Jacksonville Sheriff's Office (JSO) ordering the use of violence and unlawful arrests against peaceful demonstrators who were protesting discriminatory police conduct targeted at black people on Sunday, May 31, 2020.

14.     Just after 8:00 pm on May 25, 2020, George Floyd, a forty-six-year-old father, son, brother, and black man was accused of a non-violent offense and arrested by the Minneapolis police. In the process of his arrest, Mr. Floyd was handcuffed and fell to the pavement. Less than ten minutes after the police arrived, a police officer placed his knee and the weight of his body on Mr. Floyd's neck as Mr. Floyd lay on the ground. For eight minutes and forty-six seconds, the officer held his knee on Mr. Floyd's neck as Mr. Floyd pleaded for relief. Other officers held his legs or stood by and watched while he died. Among Mr. Floyd's final words were those spoken by Eric Garner before he was killed by a New York City police officer in 2014—"I can't

breathe"— which have since become a tragic rallying cry for people seeking to address racial inequities and reform the American criminal justice system.

15.     On May 31, 2020, protestors congregated peacefully outside the Duval County courthouse to protest police brutality against black people in the wake of George Floyd's killing. At some point during the protest, a phalanx of over fifty JSO officers and Florida State Troopers wearing riot gear and carrying batons marched along the street adjoining the courthouse and formed a skirmish line around the protestors.

16.     Toward the beginning of the protest, JSO allegedly made the following announcement to the attendees:

> The Jacksonville Sheriff's Office (JSO) respects and acknowledges the rights of persons to express their views in a lawful manner. JSO's role is to protect the rights of the public and peaceful protestors by enforcing the law and maintaining order. During a lawful protest, JSO will, however, take appropriate action in response to anyone who breaches the peace, engages in disorderly conduct, incites a riot by words or actions, or when other criminal violations are observed or reported. Please be reminded that anyone who engages in unlawful behavior that obstructs or interferes with a lawful and peaceful protest may also be subject to arrest or citation. If you have any questions regarding what is or is not prohibited activity, please ask to speak to an on-scene police supervisor. Thank you for your assistance and cooperation in maintaining order and civility today.

17.     Video evidence showed that the crowd of protestors at the protest that day was not uncontrollably large, rather it consisted of three-to-four rows of individual protestors holding signs that did not even fill up half of the sidewalk leading into the courthouse. Furthermore, given that the protest was held on a Sunday, traffic in the area was light to non-existent. While the protestors themselves were occupying the sidewalks and not blocking the street, JSO staged twenty to thirty officers in riot gear in front of the protestors directly on Adams Street, which adjoins the south-facing entrance of the courthouse.

4

18.     Later that day, JSO made an announcement to "disperse the area" to those who were present. At the time the order was given, the protesters were peacefully protesting on the sidewalks directly in front of the courthouse and not engaged in any violent or unlawful behavior. Video footage of the courthouse protests shows that the members of the crowd were peacefully standing along the courthouse sidewalk, not causing a disturbance, or blocking the flow of traffic. At this time, Plaintiff Delanie Smith approached a JSO officer to assist them in ensuring the protestors disbursed peacefully. Ms. Smith then asked the JSO officers if the protestors could continue to protest in small groups.

19.     After Plaintiff Smith confirmed that JSO was ordering them to leave the courthouse, the protestors began to walk away from the area along the sidewalk and courthouse lawn. The JSO officers did not provide a reason for why the crowd needed to disperse, other than to cryptically state that it was "due to concerns of public safety."

20.     While the crowd at the courthouse was dispersing, JSO officers commenced using force and indiscriminately arresting protestors—many of whom were complying with the dispersal order. For example, as Plaintiff Smith was assisting the officers by asking the protestors to leave the area, Officer Wing arrested her for unlawful assembly.

21.     Plaintiff Elizabeth Mulroney was walking with other protestors away from the courthouse after JSO gave the order to disperse. The JSO officers blocked all three streets surrounding the courthouse, meaning the only direction the protestors could travel was either toward the courthouse or toward the officers. As Plaintiff Mulroney neared the intersection of Broad Street and West Duval Street—an intersection on the opposite side of the courthouse from where the order to disperse was given—Plaintiff Mulroney asked an officer for directions as to how she could get to her vehicle. The officer responded by yelling "arrest her!" Two other officers

then grabbed her and twisted her arm behind her back and arrested her on the charge of unlawful assembly.

22.     Plaintiff Mulroney asked to be taken to the hospital due to the substantial pain in her shoulder caused by the use of force.

23.     Once she was discharged from the hospital, Plaintiff Mulroney was booked into the Duval County Jail.

24.     Across the street from the courthouse, a filmmaker documenting the protest named Bernardo Santana was filming JSO officers as they arrested another protestor. The JSO officers told Mr. Santana to step back. Mr. Santana complied with the order, stepping backward as he continued to film. Another officer then grabbed Mr. Santana from behind and threw him onto the pavement. A JSO officer then arrested Mr. Santana for unlawful assembly.

25.     JSO continued to indiscriminately arrest protestors as they left the crowd gathered in front of the courthouse. In five of the arrests, the officers even noted in their reports that the protestors were walking away when they were arrested.

26.     Furthermore, these arrest reports indicate JSO officers arrested these protestors when they were in different areas from one another and the south-facing entrance of the courthouse where the order to disperse had been given.

27.     In other words, even from the arresting officers' accounts, the protestors were dispersed at the time of their arrests.

28.     Other protestors—including Plaintiffs Briauna Bosworth and Sharrona Brightman—marched along the sidewalks of downtown Jacksonville in peaceful protest toward the Main Street Bridge.

29.     A group of protestors began walking in the roadway on the ramp leading up to the Main Street Bridge when a convoy of JSO trucks approached the crowd.

30.     As JSO approached, the majority of the protestors parted to the side to allow them through, climbing over the railing onto the sidewalk and out of the way of traffic. Two individuals broke away from the crowd and stood in front of the JSO trucks.

31.     Several JSO officers then exited their trucks and approached the crowd gathered on the sidewalk.

32.     Three officers grabbed a protestor (not one of the individuals blocking traffic) who had his back against the railing and pulled him to the ground.

33.      A JSO officer then walked down the line of protestors and deployed chemical spray indiscriminately into the protestors gathered on the sidewalk.

34.     JSO then ordered the protestors on the bridge to disperse.

35.     However, the officers blocked the protestor's egress on the sidewalk leading off the bridge, forcing the protestors to either walk toward the officers or cross the bridge.

36.     Many of the protestors leapt over the ramp railing to reach a sidewalk not blocked by JSO so they could leave the area and recover from the use of chemical spray.

37.     At this time, Plaintiffs Bosworth and Brightman proceeded down the sidewalks of Jacksonville back toward the courthouse.

38.     When Plaintiffs Bosworth and Brightman reached the courthouse they were advised by members of JSO that they could not be there.

39.     Plaintiffs Bosworth and Brightman then proceeded to walk back east through downtown.

40.     As Plaintiffs Bosworth and Brightman neared the Police Memorial Building, they turned south and then proceeded west down Bay Street.

41.     As Plaintiffs Bosworth and Brightman arrived at the corner of Bay Street and Market Street, Officer Cannaday arrested Plaintiff Bosworth and Officer Stuhr arrested Plaintiff Brightman on charges of unlawful assembly.

42.     At no time were either Plaintiffs Brightman or Bosworth engaging in any acts of violence or obstructing the roadways for travel.

43.     Other protestors marched peacefully along Bay Street, which is located several blocks away from both the Courthouse and Main Street Bridge.

44.     Videos taken at the time show the protestors walking down a sidewalk, some of them carrying signs, in an orderly fashion and not acting violently and not obstructing traffic.

45.     A group of JSO officers driving down Bay Street passed by the protestors.

46.     Video shows immediately after JSO's arrival, the calm tenor of the proceedings change, as protestors can be seen running in a panic from the area where JSO just arrived.

47.     While it is not clear from the video what transpired to cause the protestors to flee, the video evidence leading up to the incident demonstrates that the situation presented no threat of imminent danger that would require JSO to intervene.

48.     Shortly after the protestors begin fleeing down Bay Street, several JSO officers can be seen grabbing a protestor by the back and waist.

49.     Video footage from another angle of the incident showed one JSO officer holding the protestor in a chokehold while another officer rushed forward and punched the protestor in the face. The officers then threw the protestor to the ground.

50.     In another video captured shortly after the protester is beaten by JSO officials, two protestors can be seen walking on the sidewalk off of Bay Street on to Market Street.

51.     The two protestors seen on the video were walking alone and away from the Bay Street area toward a row of parked cars, where other pedestrians can be seen walking on the sidewalk unmolested by JSO.

52.     JSO officers then blocked their path, causing the protestors to attempt to walk around them on the sidewalk, away from an area where JSO officers are seen arresting another protestor.

53.     A JSO officer then guides one protestor to the wall—who complies by walking in the direction where the JSO officer pushed him and putting her hands against the wall.

54.     The JSO officer then wrapped his arm around the protestor's neck and threw her onto the pavement.

55.     Another JSO officer then threw the other protestor to the ground as well.

56.     Only three seconds elapse on the video from the time when the officers initially stopped the protestors to when they threw the protestors to the ground, during which time no audible commands can be heard being given to the protestors.

57.     All told, JSO arrested fifty-four protestors during the protests on May 31, 2020.

58.     The majority of protestors were charged with unlawful assembly or resisting an officer without violence.

59.     The protestors arrested that afternoon were not processed into the Duval County Pre-Trial Detention center until after a curfew that had been declared that evening.

60.     The protestors were not allowed to post bond according to Duval County's bond schedule and were instead detained until their first appearance hearing on June 1, 2020.

61.     Even though the overwhelming majority of arrests were for non-violent offenses, the protestors (with few exceptions) were given higher bonds than those set on the bond schedule if they did not take a plea offer of five days in jail.

62.     After reviewing video footage of the protest, the State Attorney's office dropped the criminal charges of forty-eight protestors.

63.     Since the week of George Floyd's killing protestors have continued to stage demonstrations in downtown Jacksonville.

64.     The Plaintiffs desire to continue to engage in peaceful protests regarding the systemic injustices perpetrated by law enforcement against black people in the United States.

65.     On June 11, 2020, GOP officials announced that Jacksonville will host the Republican National Convention.

66.     President Trump is scheduled to give his nomination acceptance speech on August 27, 2020.

67.     The President himself has become a prominent figure in the protests and controversy surrounding George Floyd's killing after posting incendiary tweets decrying protestors such as referring to them as "THUGS" and posting "when the looting starts, the shooting starts," a racist slogan used by a Miami police chief to advocate for police brutality and discriminatory practices targeting African Americans.

68.     Indeed, on June 1, 2020, President Trump told state governors on a conference call that they need "dominate" protestors to quell the protests taking place around the country and if they did not, they were "going to look like a bunch of jerks."

69.     That same day, D.C. authorities, allegedly at the request of Attorney General William Barr, dispersed protestors near the White House so that President Trump could hold a photo-op at St. John's Episcopal Church.

70.     President Trump's speech coincides with the sixtieth anniversary of Axe-Handle Saturday—an event where a group of 2000 white men gathered in Heming Park in downtown Jacksonville with baseball bats and ax handles and attacked black protestors conducting sit-ins. The white mob spread and then attacked all black people in sight.

71.     Given Trump's prominent role in the nation-wide protests and the timing of his acceptance speech at the RNC, there is a high likelihood of protest and police presence on par or greater than those present on the weekend following George Floyd's killing.

72.     Plaintiffs have a fundamental constitutional right to assembly, association and to redress the government of their grievances.

73.     Defendant Williams' practice of arresting and utilizing force upon peaceful protestors violates Plaintiffs' First Amendment Constitutional right to freedom of speech, assembly, and to petition the government for a redress of their grievances.

74.     The actions of Defendants deprives Plaintiffs of certain constitutional rights yet the deprivation of these rights is neither necessary nor reasonably related to the safety of Duval County or for the reasonable protection of the public.

75.     As a proximate result of Defendant Williams' policies, practices, customs, acts and omissions complained of herein and the conditions and circumstances described to which Plaintiffs will be subjected, Plaintiffs will suffer and continue to suffer immediate and irreparable injury should such practices, customs, policies, acts and omissions be permitted to continue.

76.     Plaintiffs have no adequate or complete remedy at law to address the wrongs described herein.

77.     Plaintiffs continue to be irreparably injured by the practices, customs, policies, rules, acts and omissions of Defendant unless the Court grants immediate injunctive relief which Plaintiffs seek.

**COUNT I**
**FIRST AMENDMENT FREEDOM OF ASSEMBLY**
**(Defendant Williams)**

78.     Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

79.     Sheriff Williams' practice, custom and/or policy of ordering peacefully assembled protestors to disperse when those protestors did not pose a clear and present danger of imminent violence, harm to public order, and were not blocking traffic violated Plaintiffs' right to assembly protected by the First Amendment to the United States Constitution.

80.     Sheriff Williams practice, custom and/or policy of arresting and using excessive force against Plaintiffs and other protestors to silence them deprives Plaintiffs of their rights under the First Amendments to the United States Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)     A declaratory judgment that Jacksonville Sheriff's Office practice, custom and/or policy of arresting and utilizing force on peaceful protestors is unconstitutional and violates the First Amendment;

(b)     An order enjoining Defendant and its agents and all persons acting in concert with from in any way arresting or using force against persons engaged in peaceful protests;

(c)     An award of reasonable attorney's fees and costs; and

(d)     Such other relief that this Court deems necessary and proper.

**COUNT II**

## FOURTH AMENDMENT UNREASONABLE SEIZURES
### (Defendant Williams)

81.　　Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

82.　　Sheriff Williams' custom and/or policy of arresting and using excessive force against Plaintiffs and other protestors without probable cause to believe they committed a crime violates their Fourth Amendment Rights.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)　　A declaratory judgment that Jacksonville Sheriff's Office practice of arresting and utilizing force on peaceful protestors without probable cause to believe they committed a crime is unconstitutional and violates the Fourth Amendment;

(b)　　An order enjoining Defendant and its agents and all persons acting in concert with them from in any way arresting or using force against persons engaged in peaceful protests;

(c)　　An award of reasonable attorney's fees and costs; and

(d)　　Such other relief that this Court deems necessary and proper.

## COUNT III
### 42 U.S.C. § 1983: FIRST AMENDMENT RETALIATION
### (Defendant Wing)

83.　　Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

84.　　Plaintiff Delanie Smith engaged in constitutionally protected speech by protesting the gross, systemic injustices perpetrated by law enforcement against black people in the United States, exemplified by the brutal murder of George Floyd.

85.　　Defendant Wing retaliated against Plaintiff Smith by arresting her.

86.　　Plaintiff's critical speech made while participating in the protest directly caused Defendant Wings' conduct.

87.     As a direct and proximate result of Defendant Wing's retaliation, Plaintiff suffered damages, including, but not limited to, pain and suffering, loss of liberty, injury to reputation, humiliation, monetary loss of earnings, and severe emotional and psychological distress.

WHEREFORE, Plaintiff, Delanie Smith, demands judgment against Defendant Wing for:

(a)     actual and compensatory damages;

(b)     punitive damages;

(c)     an award of attorney's fees and costs; and

(d)     any other relief this Court deems just and proper.

## COUNT IV
## 42 U.S.C. § 1983: FALSE ARREST
### (Defendant Wing)

88.     Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

89.     Defendant Wing arrested Plaintiff Smith without probable cause or even arguable probable cause.

90.     Defendant Wing's action in seizing Plaintiff Smith constitutes an unreasonable search and seizure of Plaintiff under the Fourth Amendment to the United States Constitution.

91.     As a direct and proximate result of Defendant Wing's unlawful seizure, Plaintiff Smith suffered damages, including, but not limited to, pain and suffering, loss of liberty, injury to reputation, humiliation, monetary loss of earnings, and severe emotional and psychological distress.

WHEREFORE, Plaintiff, Delanie Smith, demands judgment against Defendant Wing for:

(a)     actual and compensatory damages;

(b)     punitive damages;

(c)     an award of attorney's fees and costs; and

(d)     any other relief this Court deems just and proper.

### COUNT V
### 42 U.S.C. § 1983: FIRST AMENDMENT RETALIATION
### (Defendant Cannaday)

92.     Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

93.     Plaintiff Briauna Bosworth engaged in constitutionally protected speech by protesting the gross, systemic injustices perpetrated by law enforcement against black people in the United States, exemplified by the brutal murder of George Floyd.

94.     Defendant Cannaday retaliated against Plaintiff Bosworth by arresting her.

95.     Plaintiff Bosworth's critical speech made while participating in the protest directly caused Defendant Cannaday's conduct.

96.     As a direct and proximate result of Defendant Cannaday's retaliation, Plaintiff Bosworth suffered damages, including, but not limited to, funds expended on bail, loss of liberty, injury to reputation, humiliation, monetary loss of earnings, pain and suffering and severe emotional and psychological distress.

WHEREFORE, Plaintiff, Briauna Bosworth, demands judgment against Defendant Cannaday for:

(a)     actual and compensatory damages;

(b)     punitive damages;

(c)     an award of attorney's fees and costs; and

(d)     any other relief this Court deems just and proper.

### COUNT VI
### 42 U.S.C. § 1983: FALSE ARREST

**(Defendant Cannaday)**

97.     Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

98.     Defendant Cannaday arrested Plaintiff Bosworth without probable cause or even arguable probable cause.

99.     Defendant Cannaday's action in seizing Plaintiff Bosworth constitutes an unreasonable search and seizure of Plaintiff under the Fourth Amendment to the United States Constitution.

100.    As a direct and proximate result of Defendant Cannaday's unlawful seizure, Plaintiff Bosworth suffered damages, including, but not limited to, funds expended on bail, loss of liberty, injury to reputation, humiliation, monetary loss of earnings, pain and suffering and severe emotional and psychological distress.

WHEREFORE, Plaintiff, Briauna Bosworth, demands judgment against Defendant Cannaday for:

(a)     actual and compensatory damages;

(b)     punitive damages;

(c)     an award of attorney's fees and costs; and

(d)     any other relief this Court deems just and proper.

<u>**COUNT VII**</u>
<u>**42 U.S.C. § 1983: FIRST AMENDMENT RETALIATION**</u>
**(Defendant Stuhr)**

101.     Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

102.     Plaintiff Sharrona Brightman engaged in constitutionally protected speech by protesting the gross, systemic injustices perpetrated by law enforcement against black people in the United States, exemplified by the brutal murder of George Floyd.

103.     Defendant Stuhr retaliated against Plaintiff Brightman by arresting her.

104.     Plaintiff Brightman's critical speech made while participating in the protest directly caused Defendant Stuhr's conduct.

105.     As a direct and proximate result of Defendant Stuhr's retaliation, Plaintiff Brightman suffered damages, including, but not limited to, funds expended on bail, loss of liberty, injury to reputation, humiliation, monetary loss of earnings, pain and suffering and severe emotional and psychological distress.

WHEREFORE, Plaintiff, Sharrona Brightman, demands judgment against Defendant Stuhr for:

(a)     actual and compensatory damages;

(b)     punitive damages;

(c)     an award of attorney's fees and costs; and

(d)     any other relief this Court deems just and proper.

## **COUNT VIII**
### **42 U.S.C. § 1983: FALSE ARREST**
### **(Defendant Stuhr)**

106.    Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

107.    Defendant Stuhr arrested Plaintiff Brightman without probable cause or even arguable probable cause.

108.    Defendant Stuhr's action in seizing Plaintiff Brightman constitutes an unreasonable search and seizure of Plaintiff Brightman under the Fourth Amendment to the United States Constitution.

109.    As a direct and proximate result of Defendant Stuhr's unlawful seizure, Plaintiff Brightman suffered damages, including, but not limited to, funds expended on bail, loss of liberty, injury to reputation, humiliation, monetary loss of earnings, pain and suffering and severe emotional and psychological distress.

WHEREFORE, Plaintiff, Sharrona Brigthman, demands judgment against Defendant Stuhr for:

    (a)    actual and compensatory damages;

    (b)    punitive damages;

    (c)    an award of attorney's fees and costs; and

    (d)    any other relief this Court deems just and proper

## COUNT IX
## 42 U.S.C. § 1983: FIRST AMENDMENT RETALIATION
### (Defendant John)

110.     Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

111.     Plaintiff Elizabeth Mulroney engaged in constitutionally protected speech by protesting the gross, systemic injustices perpetrated by law enforcement against black people in the United States, exemplified by the brutal murder of George Floyd.

112.     Defendant John retaliated against Plaintiff Mulroney by arresting her and twisting her shoulder during the arrest, requiring her hospitalization.

113.     Plaintiff Mulroney's critical speech made during the protest directly caused Defendant John's conduct.

114.     As a direct and proximate result of Defendant John's retaliation, Plaintiff Mulroney suffered damages, including, but not limited to, funds expended on bail, loss of liberty, injury to reputation, humiliation, monetary loss of earnings, physical injury, pain and suffering and severe emotional and psychological distress.

WHEREFORE, Plaintiff, Elizabeth Mulroney, demands judgment against Defendant John for:

(a)     actual and compensatory damages;

(b)     punitive damages;

(c)     an award of attorney's fees and costs; and

(d)     any other relief this Court deems just and proper.

## COUNT X
## 42 U.S.C. § 1983: FALSE ARREST
### (Defendant John)

115.   Paragraphs 1 through 77 above are realleged and incorporated by reference herein.

116.   Defendant John arrested Plaintiff Mulroney without probable cause or even arguable probable cause and during the arrest twisted her shoulder such that she required hospitalization.

117.   Defendant John's actions in seizing Plaintiff Mulroney constitute an unreasonable search and seizure of Plaintiff Mulroney under the Fourth Amendment to the United States Constitution.

118.   As a direct and proximate result of Defendant John's unlawful  seizure, Plaintiff Mulroney suffered damages, including, but not limited to, funds expended on bail, loss of liberty, injury to reputation, humiliation,  monetary loss of earnings, physical injury, pain and suffering and severe emotional and psychological distress.

WHEREFORE, Plaintiff, Elizabeth Mulroney, demands judgment against Defendant John for:

(a)     actual and compensatory damages;

(b)     punitive damages;

(c)     an award of attorney's fees and costs; and

(d)     any other relief this Court deems just and proper

## COUNT IV
## 42 U.S.C. §1983: MUNICIPAL LIABILITY
### (Defendant Williams)

119.    Paragraphs 1 through 52 above are realleged and incorporated by reference herein

120.    Defendant Williams, in his official capacity as Sheriff of the City of Jacksonville, his agents and employees, acting within their authority and under color of state law, instituted and followed practices, customs, and policies which directly resulted in the unlawful arrests and use of force against Plaintiffs, which were the moving force causing their injuries and is actionable under 42 U.S.C. §1983 as a violation of the First and Fourth Amendments to the United States Constitution.

121.    The Sheriff's Office has exhibited a widespread custom practice, and/or policy of violating these rights as exhibited by the numerous arrests and uses of force carried out during the protests.

122.    By encouraging and failing to discipline his officers for these constitutional violations, Defendant Williams has ratified his officers' decisions and reasons for those decisions, thus constituting a practice, custom and/or policy.

123.    Alternatively, the officers acting on the scene were the final policy makers for the Sheriff's Office, as their decisions were not immediately or effectively reviewable.

117.    As a direct and proximate result of Sheriff Williams' practice, custom and/or policy, Plaintiffs have suffered damages, including, but not limited to, funds expended on bail, loss of liberty, injury to reputation, humiliation, monetary loss of earnings, pain and suffering, physical injuries, and severe emotional and psychological distress.

WHEREFORE, Plaintiffs, Delanie Smith, Briauna Bosworth, Sharrona Brigthman, Elizabeth Mulroney demand judgments against Defendant, Sheriff Williams, in his official capacity as Sheriff for the City of Jacksonville, for:

(a)     actual and compensatory damages;

(b)     an award of attorney's fees and costs; and

(c)     any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable.

DATED this ___19th___ day of June, 2020.

MRK/km[Protestors.Verified.complaint]

Respectfully submitted,

Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jesse B. Wilkison, Esquire
Florida Bar No.: 118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:    (904) 356-9661
Facsimile:    (904) 356-9667
mail: sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFFS

DEXTER VAN DAVIS, ESQUIRE
Florida Bar No.: 0121967
303 N. Liberty Street
Jacksonville, Florida 32202
(904) 355-0102
(904) 354-0122 Facsimile
Email: dvdavis@35davis.com
          awilliams@35davis.com
COUNSEL FOR PLAINTIFFS

JESSE N. DREICER, ESQUIRE
Bar No.: 47505
1833 Atlantic Boulevard
Jacksonville, Florida 32207
P:  904.396.3344
F:  904.396.3349
Email:  jesse@tassonelaw.com
COUNSEL FOR PLAINTIFFS