UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**DELAINE SMITH et. al,**
    **Plaintiffs,**

vs.                                                            Case No.:  3:20-cv-00629

**SHERIFF MIKE WILLIAMS et. al,**
    **Defendant.**

_____

## REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
### A. May 31, 2020 Protests

Numerous factual claims made in the declarations submitted by the Sheriff to justify dispersal orders, arrests, and uses of force are contradicted by the record and video evidence.[1] The declarations claim JSO initially began ordering protestors to disperse because the protestors were "somewhat unruly and took over the roadways" and later "throwing objects and moving into the roadway." (Doc. 23 at 85–86; 181). Despite how often these declarations rely on impediments to traffic to justify dispersal orders, the videos depict protestors standing on the sidewalk while JSO occupied the roads. *See, e.g.,* Courthouse Protest Video 1, attached as Exhibit 1; Doc. 11-8; 11-11. Furthermore, the claims that protestors threw bottles or other objects are refuted by the videos capturing the protestor's behavior at the courthouse as well as the testimony of the protestors present there. *See* Affidavit of Bailee Ingersoll, attached as Exhibit 2; Declaration of Delanie Smith, attached as Exhibit 3; Declaration of Elizabeth Mulroney, attached as Exhibit 4; Affidavit of Deanna Baldacci, attached as Exhibit 5.

---

[1] The Sheriff's evidentiary submissions place substantial weight on alleged violence and property damage that occurred during protests on May 30, 2020, but these events do not provide a legal justification for disbanding peacefully assembled protestors the following day. (Doc. 23 at 4); *Collins v. Jordan*, 110 F.3d 1363, 1372–73 (9th Cir. 1996). In contrast to the Sheriff's characterization of events occurring the previous day, video evidence shows the May 31 protestors courthouse were behaving in a calm and peaceful manner. Furthermore, the Sheriff's own protest activity summary indicates no injuries or property damage occurred during the protests on May 31.w (Doc. 23 at 264).

Assistant Chief Johnson claims the dispersal orders issued by JSO used a script that specified the specific location to disperse, the most convenient routes of dispersal and articulating a reasonable amount time to disperse. (Doc. 23 at 168)[2]. The videos, however, show no clear and specific guidance being given. In one video, for example, officers corralled a small group of protestors around the courthouse. Ex. 2-C at 1:46. Once the protestors reached the side of the courthouse—*away* from the area where the dispersal orders were given—a protestor asked the officers, "can we stand here? Is this okay?" *Id.* Less than three seconds later, a masked officer grabbed a protestor from behind and slammed to him ground. *Id.* at 1:57. The videographer then walked back pursuant to JSO's directives but was also grabbed from behind and thrown to the ground shortly thereafter. *Id.* at 1:58–2:11; Ex. 2 at ¶ 4. As such, the manner in which JSO enforced the orders to disperse failed to provide clear direction to those attempting to comply with them, while efforts to seek clarification were met with force and arrests.[3]

In regard to the protests at the Main Street Bridge, Johnson claims he ordered protestors to disperse because "multiple persons began to march up the ramp from Bay Street in an apparent attempt to block traffic on the bridge" and that "he was concerned for their safety and concerned for citizens who would be trapped in vehicles and the use of the drawbridge would be impacted if the protestors did in fact block the bridge." (Doc. 23 at 86–87). However, the video shows only two individuals actually blocked the street—with the demonstration itself confined to the sidewalk.

---

[2] Another evidentiary submission by the Sheriff states: "it is imperative that all reports be comprehensive as possible, especially when articulating the probable cause for arrest. Factors to include if possible are: what deliberate action did the subject engage in that significantly impeded the successful function of the assembly?" and "the number of warnings given to an individual prior to arrest." (Doc. 23 at 25–26). The 54 arrest reports on May 31, however, are almost universally silent on these factors—reinforcing the video evidence demonstration that there were no specific actions committed by the protestors that led to their arrest and they were arrested without warning.

[3] The protestors' confusion regarding these orders to disperse are unsurprising, given Assistant Chief Johnson's declaration demonstrates the same murky grasp of the concept as that found in many of the arrest reports, featuring paradoxical and internally inconsistent turns of phrase like "the crowd splintered into multiple groups but did not disperse and they began to head in different directions. (Doc. 23 at 87).

(Doc. 11-8). Further, the attached CAD logs indicate JSO instructed the bridge tender to raise the bridge within 20 seconds of the protestor's approach. (Doc. 23 at 172) ("4:51:35 P.M.-INDIVS GOING ACROSS MAIN ST BRIDGE"; "4:51:58 P.M.-BRIDGE TENDER NEEDS TO RAISE MAIN ST BRIDGE"). In other words, despite claiming he ordered the protestors to disperse due to fears they would block traffic, JSO itself was already blocking traffic upon the protestors' arrival. The CAD logs also indicate just over a minute after the protestors arrived at the Main St. Bridge, the officers had already been ordered to "BLOCK MAIN ST. BRIDGE AND START MAKING ARRESTS." *Id; see also* Doc. 23 at 240 (noting "there was also an order via radio to arrest <u>everyone</u> on the bridge" before the officer ordered the protestors to leave the bridge) (emphasis added).

In regard to the deployment of chemical spray at the bridge, Officer Day justified his actions by claiming field force members were affecting several arrests on the walkway and "as they were doing so, a large crowd of protestors" approached yelling obscenities and were "very animated with their hands." (Doc. 23 at 240). He further claimed the protestors were "quickly advancing and were within ten feet of the officers" and that out of concern for injuries to the officers and citizens he deployed the spray "to stop the protestors' advancement upon the arresting officers." *Id.* However, the video shows the protestors subject to the chemical spray were not "quickly advancing" on anyone but were standing stationary along the ramp guard rail. *See* Doc. 11-9; *See also* Doc. 11-8 at 1:00–1:27 (showing a view of the protestors guarding the sidewalk where no officers are making arrests on the sidewalk or protestors advancing on officers prior to the time the protestors begin reacting to the spray).

Finally, Assistant Chief Johnson claims he ordered the group of protestors on West Bay St. to disperse at around 6:30 p.m., because he "observed protestors throwing bottles and other objects

3

into the roadway" and that the protestors "start[ed] to take over the street." (Doc. 23 at 87–88). However, the video evidence shows the protestors simply marching down the sidewalk along Bay Street as the JSO officers pull up alongside them. (Doc. 11-10; Doc. 11-11). The video shows the protestors do not enter street, much less "starting to take it over." *Id.*

Johnson also claims the protestors around Bay St. were arrested because: "the protestors ignored the order and continued to protest." (Doc. 23 at 88). The video taken in that area, however, shows JSO officers arresting and using force against individuals walking alone or in small groups and decidedly not "continu[ing] to protest" (*See* Doc.11-11 at 1:30–2:00; 11-12) (showing individuals being slammed to the ground and arrested while walking alone and in a group of two <u>away</u> from the Bay and Market St. intersection); Affidavit of Glen Michael Van Dyke, attached as Exhibit 6. Further, Johnson's claims regarding the Bay St. arrests are once again belied by the CAD records he attaches to his own affidavit, which indicate at 5:07 P.M.—approximately an hour and a half before he claims to have ordered the Bay St. marchers to disperse for blocking the street and throwing objects—JSO officers were already instructed: "PER 'COMMAND' NOT ENETERTAINING ANYMORE PROTESTS OR <u>LAWFUL GATHERINGS</u>, THIS IS 100% OVER, END THE SITUATION HOW IT NEEDS TO BE ENDED." (Doc. 23 at 173) (emphasis added). Thus, before the Bay St. march even began, the order had already been given to shut down the protests and "end the situation how it needs to be ended."

    **B.**    **Standing**

The Sheriff contends Plaintiffs lack standing to seek injunctive relief. Because injunctions seek to regulate future conduct, a party has standing to seek injunctive relief only if the party shows

4

"a real and immediate[4]—as opposed to merely conjecture or hypothetical—threat of future injury." *Church v. City of Huntsville,* 30 F.3d 1332, 1337 (11th Cir. 1994). "Past injury from alleged unconstitutional conduct does not in itself show a present case or controversy regarding injunctive relief, if unaccompanied by current adverse effects." *Lynch v. Baxley,* 744 F.2d 1452, 1456 (11th Cir. 1984). However, "[p]ast wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction." *Id.*

Indeed, the Eleventh Circuit has repeatedly found standing where plaintiffs have alleged prior constitutional violations coupled with circumstances likely to reoccur in the future that would place them in the same position as when their rights were violated. *See, e.g., 31 Foster Children v. Bush,* 329 F.3d 1255 (11th Cir. 2003) (finding foster children who alleged pattern and practice of substantive due process violations by state welfare officials demonstrated a real threat of future injury where the plaintiffs were still in physical custody of the defendants); *Bischoff v. Osceola Cnty, Fla¸* 222 F.3d 874, 883 (11th Cir. 2000) (finding plaintiffs had demonstrated standing to challenge certain traffic control ordinances under First Amendment grounds where they alleged they had been threatened with unlawful arrest, witnessed three others unlawfully arrested, and desired to go back to the same location in the future to resume distributing handbills); *Church v. City of Huntsville,* 30 F.3d 1332 (11th Cir. 1994) (finding homeless plaintiffs had pled a sufficient threat of future injury by alleging a practice and custom of police officers harassing homeless individuals); *Lynch*, 744 F.2d at 1456–57 (11th Cir. 1984) (finding mentally-ill plaintiff subject to two prior arrests and unlawful incarceration within a period of three years demonstrated a real threat of future injury that he would be arrested again and subject to future unlawful detentions).

---

[4] Furthermore, "[i]immediacy requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Florida State Conference of N.A.A.C.P v. Browning¸* 522 F.3d at 1152, 1161 (11th Cir. 2008).

The Sheriff relies on language and precedent arising from the Supreme Court's decision in *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983). However, the Eleventh Circuit has repeatedly cabined *Lyons* to cases where prior constitutional violations involved the unauthorized acts of a rogue officer. *See 31 Foster Children,* 329 F.3d at 1266 ("As *Lyons* illustrates, future injury that depends on either random or unauthorized acts of a third party is too speculative to satisfy standing requirements. However, when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again."); *See also Florida State Conference of N.A.A.C.P.,* 522 F.3d at 1162 (distilling relevant factors underpinning the *Lyons* standing rule as (1) relying on a sequence of individually improbable events, including future run-ins with police; (2) being predicated on the plaintiff first doing something that would at least give an officer probable cause to detain or arrest him; and (3) involving a situation where there was an adequate remedy at law for the threatened injury).

The instant case does not implicate any of the above factors. First, the threatened injury plaintiffs will suffer if an injunction is not issued does not rely on a "sequence of individually improbable events." The protests against racial injustice in Jacksonville are ongoing in and Plaintiffs have attested to their desire to continue attending them. Furthermore, the RNC coming to Jacksonville on August 27, 2020 will assuredly draw protestors and law enforcement presence in greater numbers than May 31. Indeed, JSO Assistant Chief Restivo has estimated the number of law enforcement personnel on hand for the event to be in the "thousands." *See* Mike Mendenhall, *JSO Offers Insight on RNC Security*, JACKSONVILLE DAILY RECORD (July 9, 2020) attached as Exhibit 7. Unlike in *Lyons*, where the chances of the plaintiff would come in contact with the police again were slim, the Plaintiffs here are certain to face identical circumstances to the encounters where their rights were violated on at least one occasion in the immediate future.

The Sheriff argues his officers are unlikely to commit future constitutional violations because they have not arrested or injured peacefully assembled protestors in the thirty-six days since the May 31 protests—during which time they claim more than thirty peaceful protests have occurred in the city. (Doc. 22 at 9). The Sheriff's evidentiary submissions offer no insight into whether these subsequent protests involved demonstrations similar in size or with a similar police presence to those occurring on May 31[5]. Thus, they provide little assurance the Sheriff will not resume unlawful arrests and uses of force at future large protests—such as those during the RNC—where militarized units like the mobile field force are deployed.

Furthermore, unlike cases decided under the *Lyons* rule, JSO's dispersal orders, arrests, and uses of force <u>were</u> authorized by the Sheriff. The Sheriff has repeatedly defended the lawfulness of JSO's actions on May 31. When reporters asked the Sheriff about the dismissed charges, he stated "it's not the fact that we made arrests that are illegal, that's not the case" and "we still feel like, especially on Sunday—Saturday and Sunday—we took the necessary steps to keep the city safe." *See Speaking with Law Enforcement on Protests*, NEWS4JAX AT 2:21–3:14 (June 12, 2020) *available at* https://www.news4jax.com/video/video/2020/06/12/speaking-with-law-enforcement-on-protests/.[6]

---

[5] In fact, some of the "protests" identified by Undersheriff Ivey consisted of a luncheon at the River Club and President Trump's "birthday boat rally." (Doc. 23 at 262). Additionally, the "protest" march led by Jaguars running back Leonard Fournette, in which Sheriff Williams and Mayor Curry participated, had a large number of JSO officers escorting and marching in the protest itself, as opposed to the confrontational nature of the May 31 protests, and can hardly be compared to that protest or the protests likely forthcoming.

[6] The Sheriff further attempted to explain the fact that the state attorney dropped the charges against 48 of the 53 protestors arrested on May 31 by vaguely referring to "challenges with documentation on our end," even though the arrest reports state that each arrest was captured by JSO body cameras. *Id.* Conspicuously absent from the Sheriff's submissions is any video footage whatsoever, whether it be police body camera footage or drone footage, corroborating any of the assertions contained in the declarations regarding violent protestor conduct. The Sheriff was also asked how he would respond to peaceful protestors at the RNC, to which he echoed his prior comments defending the May 31 arrests: "it's not a peaceful protest once the first rock is thrown or the fire is lit. At that point, there is no controlling the group, obviously the group would have no control over itself. So that's where the posture changes." *Id.* at 3:15–3:52. This rhetoric reflects the Sheriff's intent to, once again, indiscriminately shut down peaceful assemblies across the City if a single person commits a crime.

The declarations submitted by the Sheriff have also defended the lawfulness of the May 31 arrests and uses of force. (Doc. 23 at 182, 252). Given the Sheriff's repeated and strenuous defense of his officer's actions, it is highly likely the Sheriff will continue with the same constitutional violations at the RNC and future protests. *See Honig v. Doe*, 484 U.S. 305, 322 (1988) (finding sufficient likelihood that school officials would violate the Education of the Handicap Act in the future based in part on state official's insistence that their conduct was lawful and noting if officials were acting in an unauthorized manner "petitioner would not now stand before us seeking to defend the right of all school districts to engage in such aberrant behavior.").

These factors also distinguish the instant case from the Seventh Circuit decision on which the Sheriff relies for his standing analysis. *See Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010). In *Schirmer*, the court was persuaded by the fact that the plaintiff's arrests actually violated the policy which they sought to enjoin. *Id.* at 586–587. In articulating its holding, the court listed several caveats. First, it noted "if we had any indication that the police were even arguably acting within the scope of the failure-to-disperse provision when they arrested plaintiffs, then these plaintiffs could have standing to challenge the facial constitutionality of that provision and to request injunctive relief." *Id.* at 587. The court further noted, "[p]erhaps if we had a record showing a persistent pattern of similar police misconduct, persons intending to engage in protected speech and expression might be able to show they were entitled to injunctive relief of some kind, if not all enforcement of the provision then at least against such future misconduct. The record before us, however, shows only an isolated misuse of the failure-to-disperse provision." *Id.* at 588. (citation omitted). In this sense, *Schirmer* is another example of a single constitutional violation committed by a rogue officer in the vein of *Lyons*.

*Schirmer*'s analysis holds little persuasive value in the instant case for several reasons. First, the Eleventh Circuit has held two-to-three arrests coupled with an allegation plaintiffs intended to continue the activity that got them arrested was sufficient to establish standing in light of the precedent discussed above. *See*, *Bischoff v. Osceola Cnty, Fla*¸ 222 F.3d 874, 883 (11th Cir. 2000) *Lynch*, 744 F.2d at 1456–57 (11th Cir. 1984). Second, the facts here differ from *Schirmer*, and, indeed, fall within facts *Schirmer* held would support standing for injunctive relief. As discussed above, the actions taken by JSO officers here were authorized by the sheriff. Furthermore, the arrests here were not an "isolated misuse" of policy committed by a single officer. Rather, these violations were the result of a coordinated effort spanning dozens of officers, multiple units in locations across downtown Jacksonville, and the arrests of forty-eight individuals in instances where the facts did not support criminal charges for unlawful assembly or resisting an officer without violence. Therefore, the facts here demonstrate a probability of future harm sufficient to support standing for injunctive relief.

**C.    Municipal Liability**

The Sheriff devotes the entirety of his argument regarding Plaintiff's likelihood of success on the merits to municipal liability. (Doc. 22 at 11–17). Under §1983, a municipality may only be held liable "when execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy inflicts the injury." *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). Municipal policy is created where the municipality's final policymaker authorized or ratified conduct giving rise to a constitutional violation. "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur v. City of Cincinatti*, 575 U.S. 469, 482 (1986). Furthermore, "when a

9

subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their policies*. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988).

Here, the record shows that the directive to give dispersal orders came directly from the Sheriff's chain of command. (Doc. 23 at 86–88, 172–173, 240). Furthermore, the Sheriff's strident defense of his officers' conduct and lack of action against the officers engaged in the same demonstrate ratification of both the constitutional violations committed during the May 31 protests as well as the future violations.

Additionally, "a custom or practice, while not adopted as an official formal policy, may be so pervasive as to be the functional equivalent of a formal policy." *Grech v. Clayton Cnty, Ga.,* 335 F.3d 1326, 1330 n. 6 (11th Cir. 2003); *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496 (11th Cir. 1986) (upholding municipal liability for excessive force where the plaintiff had presented evidence of five incidents where officers had used excessive force and not been punished.) Here, the unrefuted affidavits submitted by Plaintiffs show at least seven officers arrested protestors who were complying with dispersal orders. This is not to mention over forty other arrests, numerous officers captured on video using force against protestors attempting to comply with dispersal orders, and even more numerous officers who stood idle while their colleagues committed these violations. To suggest the systematic and widespread violations committed by these officers were isolated and unauthorized strains plausibility. Therefore, the constitutional violations alleged in the Complaint were caused by an official policy authorized and ratified by the Sheriff and demonstrated through widespread practice of his officers.

Respectfully submitted,

/s/ Matthew R. Kachergus
Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jesse B. Wilkison, Esquire
Florida Bar No.: 118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:   (904) 356-9661
Facsimile:   (904) 356-9667
mail: sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to **Dexter Davis, Esquire, dvdavis@35davis.com**, Jesse N. Driecer, Esquire, jesse@tassonelaw.com, Stephen Powell, Esquire, spowell@coj.net, and Mary Margaret Giannini, Esquire, mgiannini@coj.net, via the Florida Courts E-Filing Portal, this 10th day of July 2020.

/s/ Matthew R. Kachergus
ATTORNEY